Ray MARSHALL, Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

Ruth A. BRUNNER, Executrix of the
Estate of Robert Brunner, Defendant.

Civ. A. No. 77–624.

United States District Court,
W. D. Pennsylvania.

Oct. 9, 1980.

Marshall H. Harris, Regional Sol., U. S. Dept. of Labor, Philadelphia, Pa. (Working in conjunction with the regional solicitor was: Joan R. Sheak and Kenneth L. Stein, Philadelphia, Pa.), for plaintiff.

Richard F. Kronz, Wendell G. Freeland, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SIMMONS, District Judge.

### Findings of Fact

1. Plaintiff, the Secretary of Labor, United States Department of Labor, brought this action to enjoin the former defendant, Robert H. Brunner, from violating the provisions of Sections 6, 7, 11(c), 12(c), 15(a)(2), 15(a)(4) and 15(a)(5) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* (hereinafter referred to as the Act).

2. During the pendency of this action, John H. Brunner died on May 14, 1980, and pursuant to F.R.C.P. Ruth A. Brunner, his wife, qualified as executrix of Robert H. Brunner's estate and was substituted as the new defendant in this case.

3. Decedent, Robert H. Brunner was at all times relevant to this action, the sole proprietor of a place of business located at 370 Rochester Road, Pittsburgh, Allegheny County, Pennsylvania. Defendant's Answer at 1.

4. Decedent, Robert H. Brunner, was at all times relevant to this action, engaged in the collection and disposal of garbage, trash and junk, trading and doing business as R. H. Brunner Sanitation Company. Defendant's Answer at 1. Decedent hired employees, set their rates of pay, and assigned job duties to each of them. Transcript, Volume II at 196.

5. The business activities of decedent's garbage, trash and junk collection and disposal operation are related and performed through unified operation or common control for a common business purpose. Defendant's Answer at 1.

6. The annual gross volume of sales made or business done by decedent at all times relevant to this action exceeded the amount of $250,000.00. Transcript, Volume I at 25.

7. At all times relevant to this action, decedent's employees have handled and worked on goods and materials that were moved in or produced for commerce. Specifically, the parties stipulated that decedent purchased, on a regular and recurring basis, the following items for use in the operation of his business: trucks and truck bodies, tires, batteries and accessories, sixty gallon containers, shovels, brooms, oil and gas. Transcript, Volume I at 23–25. It was further stipulated that at least some of these items have been manufactured outside of Pennsylvania, and had moved in interstate commerce prior to decedent's purchase thereof. Transcript, Volume I at 23–25; Volume III at 80–81, 87.

8. At all times relevant to this action, many of decedent's employees regularly collected, handled, loaded, transported and unloaded such goods as discarded automobile parts, metal household appliances, hot water tanks, and other scrap metal and junk. These goods were collected by decedent's employees during the course of their participation in township rubbish cleanups. Transcript, Volume II at 187–190, 225, 235–

237, 270–274; Volume III at 156–158; Volume IV at 205 -210, 218, 320–322; Volume VII at 791, 798.

9. Decedent's employees delivered the discarded automobile parts, metal household appliances, hot water tanks, and other scrap metal and junk to scrap metal dealers. Said scrap metal dealers sold this scrap metal and other discarded junk to manufacturers outside of Pennsylvania, who ultimately processed said scrap into auto parts, appliances, and other products. Transcript, Volume IV at 206.

10. In the course of his business operations, decedent employed truck drivers and helpers who are paid a flat daily rate of pay. The amount of said daily rate of pay varies from employee to employee and ranged, during the time period relevant to this action, from $20.00 per day to $50.00 per day.

11. The truck drivers and helpers were paid the same daily rate regardless of the number of hours they worked.

12. Decedent paid certain of his employees on an hourly basis. Transcript, Volume III at 85. Decedent paid his hourly employees for forty hours per week only, although said employees worked longer than 40 hours. Transcript, Volume III at 87–92.

13. The truck drivers and helpers employed by decedent regularly worked between 10 and 12 hours per day, and sometimes longer. Transcript, Volume I at 59–60, 69–74; Volume II at 218, 220–222, 224, 226–232, 268, 279–280; Volume III at 129–130, 132–135; Volume IV at 215–217, 222–226, 322, 329–337, 384; Volume V at 392–395, 423–425, 427–432; Volume VII at 694–697, 700–704, 783, 785–789, 828–831, 834–840.

14. Some of decedent's employees worked on Saturdays, making theirs a six day workweek. Transcript, Volume I at 71–74; Volume II at 229, 231; Volume III at 89, 133–134; Volume IV at 222–224, 226, 329–337; Volume V at 430; Volume VII at 701, 787, 804–806, 834–835.

15. Decedent did not pay some of his employees any wages for their Saturday work. Other employees were paid for their Saturday work at rates lower than their weekday daily rate of pay. Transcript, Volume II at 231; Volume IV at 225; Volume V at 430; Volume VII at 835.

16. Decedent kept no records of the hours worked by his employees on Saturdays, nor did he keep records of any wages paid for Saturday work. The Saturday wages, when paid, were not included in the weekly cash payment to the employee. Transcript, Volume II at 232; Volume IV at 315–316; Volume VII at 787; Plaintiff's Exhibits 4, 20, 27.

17. On an average, decedent's employees worked 60 hours per week in a five day week, and 68 hours per week in a six day week. Transcript, Volume I at 59–60, 69–74, 81–82; Volume II at 218, 220–222, 224, 226- 232, 237–238, 268, 279–280, 282–283; Volume III at 87–92, 129–130, 132–135, 158, 162, 173, 179; Volume IV at 215–217, 222–226, 229, 322, 329–337, 339–340, 355, 357, 384; Volume V at 392–395, 397–398, 409, 423 425, 427–432, 434–435; Volume VII at 694 697, 700–705, 722–725, 783, 785–789, 828 831, 834–840. The rates paid to many of decedent's employees were insufficient to yield the minimum wage for all hours worked per week.

18. All of decedent's drivers and many of decedent's helpers went to Mazzaro's or Bailey's Dump at least once during the workday. Transcript, Volume II at 197.

19. Decedent never instructed his helpers that they should not go to the dump. Many of the helpers who went to the dump performed work there, made additional trash pickups on the return trip from the dump to decedent's establishment, and performed additional duties upon their return to the establishment. Decedent was aware of this. Transcript, Volume II at 278–279, 298- 302, 305–307, 312, 317, 370–371; Volume III at 169–173, 183; Volume IV at 220–222, 329; Volume V at 394, 404–405, 414- 415, 420, 426, 438, 453; Volume VII at 765; Volume VIII at 927.

20. When decedent's employees arrived at Mazzaro's Dump, they signed an invoice or "dump slip", on which the time of their arrival was indicated. These dump slips corroborate the employees's testimony as to

their lengthy hours of work, since they show arrival times after 3:00 o'clock, P.M. 4:00 o'clock, P.M. and 5:00 o'clock, P.M., as well as Saturdays. The return trip from Mazzaro's to the decedent's garage took approximately 45 minutes to an additional hour. Transcript, Volume I at 27–28, 63–65, 109, 117; Volume IV at 232; Volume VII at 729–730; Volume XIV at 1680–1681; Volume XV at. 1801, 1803, 1874–1876; Plaintiff's Exhibits 3, 23, 24 and 34.

21. Decedent did not pay any of his employees time and one–half their regular rate of pay for said employees' weekly hours worked in excess of forty. Transcript, Volume I at 74; Volume II at 232–233, 280–281; Volume III at 92, 135; Volume IV at 229, 337, 384; Volume V at 395, 432; Volume VII at 703, 789, 840. Decedent does not contend that any overtime rates were paid. Transcript, Volume VIII at 912.

22. Prior to January 1977, decedent kept no records of hours worked per day and/or per week by any of his employees. Transcript, Volume I at 14–18; Volume VIII at 907.

23. In January 1977, after the close of the investigation of decedent business by the Wage and Hour Division of the United States Department of Labor, decedent began to keep a series of inaccurate time cards recording hours worked by his employees. Said time cards did not reflect the lengthy hours worked by decedent's employees. These cards, which decedent continued to maintain throughout 1977, 1978 and 1979, to date of the trial, were filled in by decedent's wife, and employees were instructed that if they did not sign these cards, they would not receive their pay. Transcript, Volume I at 27, 75–79; Volume III at 94–97, 136–138; Volume IV at 226–228, 337–338; Volume VIII at 911–912.

24. When decedent begain keeping the inaccurate time cards referred to in Finding of Fact 22, *supra*, decedent had been advised by Wage and Hour officials as well as his own counsel, of the recordkeeping requirements of the Act, and the importance of complying with them. Transcript, Volume VI at 528; Plaintiff's Exhibit 16.

25. Decedent employed several persons under the age of eighteen as helpers, both during and after the investigation of his business by the Wage and Hour Division of the United States Department of Labor. Transcript, Volume I at 20, 26–27; Volume II at 198–199; Volume IV at 229–232.

26. Decedent continued to employ minors, under 16, in the operation of his business after he had been advised by the Department of Labor officials, as well as by his own counsel, that doing so violated the Act and the Child Labor Regulations. Transcript, Volume IV at 229–232; Volume VI at 528–529; Plaintiff's Exhibit 16.

27. Both during and after the investigation of decedent's business operations by the Wage and Hour Division of the United States Department of Labor, decedent instructed some of his employees not to advise the Government's agents of the daily and weekly hours they actually worked, and threatened to discharge them if they did so. Transcript, Volume IV at 340, 383–384.

28. On April 6, 1979, approximately three weeks prior to the beginning of the trial of this case, decedent instructed all of his employees to sign statements prepared by the decedent that they never worked more than 40 hours per week. These statements were given to employees to sign on a payday. Decedent knew that his employees regularly worked more than 40 hours per week. Transcript, Volume III at 138; Volume IV at 292–294.

29. A total of $30,255.93, in unpaid minimum wages is due and owing 54 of the defendant's present and former employees. Transcript, Volumes VI, IX, X, XI. (NOTE: The Court has reduced the amount of unpaid minimum wages due each of the said employees as suggested by the Government by 20%).

30. A total of $82,181.12, in unpaid overtime compensation is due and owing 93 of the decedent's present and former employees. Transcript, Volumes, VI, IX, X and XI. (NOTE: The Court has reduced the amount of unpaid overtime compensation due each of the said employees as suggested by the Government by 20%).

31. Total back wages due 93 of decedent's employees amount to $112,437.05. This amount accrued between May 27, 1975 and April 30, 1979. The 93 employees and the amount due each appear in Schedule A to the Judgment and Order herein.

### B. *Conclusions of Law*

1. Jurisdiction over the parties to and the subject matter of this action is conferred on the Court by Section 17 of the Act.

■ 2. Decedent, Robert H. Brunner, was the sole proprietor of the Brunner Sanitation Company, and was engaged in the collection and disposal of garbage, trash and junk and, in the course of his operation of this business functioned as an employer within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d). See Finding of Fact No. 4.

■ 3. The business activities of decedent constitute an enterprise within the meaning of § 3(r) of the Act.

■ 4. At all times relevant to this action, several of decedent's employees handled and worked on goods and materials that had been moved in and produced for commerce. See Findings of Fact Nos. 7 and 8. Since the annual gross volume of sales made or business done by decedent's enterprise has exceeded $250,000.00, at all relevant times, decedent's employees are employed in an enterprise within the purview of § 3(s)(1) of the Act. The legislative history of the 1974 amendment of § 3(s)(1) makes it clear that Congress intended that any enterprise wherein two or more employees handle or work on goods or materials produced for interstate commerce by any person or goods of materials which have moved in interstate commerce, is an enterprise covered by the Act. Sen. Rep. No. 93–690, 93d Cong., 2d Sess. 17 (1974). The relevant case law also establishes that the purview of the Act includes businesses whose sole connection with interstate commerce lies in their purchase and use of equipment and supplies that have been manufactured out of state. *Dunlop v. Industrial America Corporation*, 516 F.2d 498,

501–502 (5th Cir. 1975); *Brennan v. Dillion*, 483 F.2d 1334 (10th Cir. 1974); *Marshall v. Whitehead*, 463 F.Supp. 1329, 1335 (M.D. Fla.1978); *Brennan v. Jaffey*, 380 F.Supp. 373, 378–379 (D.Del.1974); *Wirtz v. Melos Construction Corporation*, 284 F.Supp. 717, 719 (S.D.N.Y.1968), aff'd, 408 F.2d 626 (2nd Cir. 1969); *Hodgson v. Alan Hauling Services*, 68 LC § 32, 707 (D.Md.1972).

■ 5. Certain of decedent's employees who, at all times relevant to this action, regularly collected, sorted, loaded, transported, unloaded scrap metal from defendant's trucks, a substantial portion of which scrap metal was later transported, shipped, delivered, sold, or offered for sale in interstate commerce, were engaged in commerce or the production of goods for commerce within the meaning of Section 3(j) of the Act, 29 U.S.C. § 203(j). Activities such as those described herein clearly constitute the production of goods for commerce. *Western Union Telegraph Company v. Lenroot*, 323 U.S. 490, 503, 65 S.Ct. 335, 342, 89 L.Ed. 414 (1945); *Wirtz v. Sloan, Inc.*, 411 F.2d 56 (3rd Cir. 1969); *Mitchell v. Jaffe*, 261 F.2d 883 (5th Cir. 1958); *Bracey v. Luray*, 138 F.2d 8, 11–12 (4th Cir. 1943). Accordingly, decedent's business qualified as an enterprise within the meaning of Section 3(s)(1) of the Act because two or more of its employees were engaged in the production of goods for commerce, and because it also met the annual dollar volume of business requirement.

■ 6. The Act is not limited to employees who are paid by the hour; its requirements are applicable to employees who are paid on a piecework, salary, day rate, fee or other basis. *Walling v. Youngerman–Reynolds Hardwood Company*, 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945). An hourly, or "regular rate of pay" may be computed for an employee paid on a day rate basis by:

. . . totaling all the sums received at such day rates . . . in the workweek and dividing by the total hours actually worked.

29 CFR § 778.112. See also 29 CFR § 778.109.

■ 7. Since the decedent's records, during all times relevant to this action were

inadequate and inaccurate with regard to, *inter alia*, the number of hours decedent's employees worked per day and per week, it was not possible for the Government to demonstrate to a mathematical certainty, the number of hours worked per week by decedent employees. However, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946) provides that in cases such as the one at bar, where an employer's records are inadequate and inaccurate, the Court may draw a just and reasonable inference as to the number of hours worked if sufficient evidence is introduced to show the amount and extent of that work, and if the employer fails to introduce evidence negating the reasonableness of that inference. The Government, in the instant case, has introduced sufficient evidence to amply support this Court's conclusions that all of the defendant's employees worked approximately an average of 56 hours during a five day workweek. There was, moreover, ample evidence to support this Court's conclusion that certain employees regularly worked on Saturdays, and that those employees worked an approximate average of 7 hours on Saturday. Testimony concerning hours worked by no fewer than 48 of decedent's employees was introduced by the Secretary; enough to support a finding that a pattern and practice of hours worked by decedent's employees has been established. *Brennan v. General Motors Acceptance Corporation*, 482 F.2d 825, 829 (5th Cir. 1973); *Marshall v. R & M Erectors, Inc.*, 429 F.Supp. 771, 777 (D.Del.1977). The decedent has failed to rebut the reasonableness of this Court's conclusions regarding the hours worked by the involved employees.

■ 8. When the average number of hours worked is divided into the total day rates received by certain of defendant's employees in any one workweek, it is readily apparent that many employees did not receive the applicable minimum wage for all hours worked during numerous workweeks. See Conclusions of Law 7, *supra*. This was particularly true of those employees who were paid $20, $25 or $27 per day. Accord-

ingly, decedent, during numerous workweeks, violated the provisions of §§ 6 and 15(a)(2) of the Act.

9. Section 7 of the Act provides that employees covered by the Act are entitled to time and one-half their regular rate of pay for hours worked in excess of forty during any one workweek. Decedent failed to pay some of his employees time and one-half their regular rate of pay for their overtime hours, and therefore, violated §§ 7 and 15(a)(2) of the Act at all times relevant to this action.

■ 10. Decedent's employment of minors under age of eighteen years as helpers who rode on the back and/or sides of decedent's trash truck constituted oppressive child labor within the meaning of § 3(*l*) of the Act and the Regulations duly issued and found at 29 CFR Part 570. Specifically, the employment of these minors as helpers was contrary to Hazardous Order No. 2, 29 CFR § 570.52, and decedent therefore violated the provisions of § 12(c) and § 15(a)(4) of the Act.

■ 11. Decedent, at all times relevant to this action kept and maintained inadequate and inaccurate records of his employees and of the wages, hours and other terms of employment maintained by him. Accordingly, Decedent, at all times relevant to this action, violated § 11(c) and § 15(a)(5) of the Act.

■ 12. The Secretary of Labor is entitled to an injunction against decedent's personal representative and successors in interest compelling payment of back wages due and restraining future violations of the minimum wage, overtime, recordkeeping and child labor provisions of the Act as long as said business continues to operate. The continuing nature of the violations and the inaccurate records referred to in Conclusion of Law 11, make injunctive relief particularly appropriate. *Walling v. Helmerich and Payne, Inc.*, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944).

■ 13. However, although the Secretary of Labor is entitled to back wages, he is not to be awarded an equal

amount in liquidated damages, pursuant to § 16(c) of the Act under the factual circumstances surrounding the quantity and quality of the Plaintiff's proof in this case. Further, this Court is of the opinion that the defendant has sustained its burden of proving that liquidated damages should not be awarded. It is settled that the decision to award liquidated damages in addition to back wages lies within the sound discretion of the trial court. *Sturdivant v. Salt River Valley Water Users Association*, 249 F.2d 944, 950 (9th Cir. 1957); *Rothman v. Publicker Industries, Inc.*, 201 F.2d 618, 620 (3rd Cir. 1953).

## JUDGMENT AND ORDER

AND NOW, this 9th day of OCTOBER, 1980, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant, her agents, servants, employees and all persons acting or claiming to act in her behalf and interest while she is acting as the personal representative of Robert H. Brunner, and while as said representative she is operating the R. H. Brunner Sanitation Company, be, and they hereby are, permanently enjoined and restrained from violating the provisions of Sections §§ 6, 7, 11(c), 12(c), 15(a)(2), 15(a)(4) and 15(a)(5) of the Fair Labor Standards Act of 1938, as amended (52 Stat. 1060, as amended; 80 Stat. 830, 88 Stat. 55, 29 U.S.C. § 201, *et seq.*), hereinafter called the Act, in any of the following manners:

1. Defendant shall not, contrary to Section 6 of the Act, pay to any of her employees who in any workweek are engaged in commerce or in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the Act, wages at rates less than those which are now, or which in the future may become applicable under Section 6 of the Act.

2. Defendant shall not, contrary to Section 7 of the Act, employ any of her employees in any workweek who are engaged in commerce or in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the Act, for workweeks longer than the hours now, or which in the future become applicable under Sections 7 and 15(a)(2) of the Act, unless the said employees receive compensation for their employment in excess of the prescribed hours at rates not less than one and one-half times the employees' regular rates.

3. Defendant shall not fail to make, keep and preserve adequate and accurate records of her employees and of the wages, hours, and other conditions and practices of employment maintained by her as prescribed by the Regulations issued pursuant to Section 11(c) of the Act and found at 29 CFR Part 516.

4. Defendant shall not, contrary to Sections 12(c) and 15(a)(4) of the Act, employ minors under the age of 18 in commerce or in the production of goods for commerce, within the meaning of the Act, on jobs or during hours which constitute oppressive child labor as defined in Section 3(1) of the Act and the Regulations issued pursuant thereto and found at 29 CFR Part 570.

Further, the Court finding that backwage compensation is due certain employees in the amount of $112,437.05.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant is restrained from withholding the payment of the aforesaid backwage compensation to her employees and is directed to make payment of the said compensation as hereafter specified.

The provisions of this Order relative to backwage payments shall be deemed satisfied when defendant delivers to plaintiff's representatives a certified check in the amount of $112,437.05. Neither defendant nor any one on her behalf shall directly or indirectly solicit or accept the return or refusal of any sums paid as backwages under this Judgment. Plaintiff shall distribute the proceeds of the check to the employees named in Schedule A, attached hereto, or to their estates, if that is necessary, and any sums not distributed to the employees named herein, or to their personal repre-

sentative because of inability to locate the proper persons or because of such persons' refusal to accept such sums, shall be deposited with the Clerk of this Court who shall forthwith deposit such money with the Treasurer of the United States pursuant to 28 U.S.C. §§ 2041 and 2042.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the costs of this action shall be taxed against the defendant. The plaintiff shall submit a bill of costs to the Clerk of this Court within seven (7) days of the date of this Order.

## SCHEDULE "A"

| EMPLOYEE NAME | GROSS AMOUNT DUE |
|---|---|
| Alton Atcheson | 1,536.61 |
| William Bain | 697.39 |
| George Birch | 1,064.67 |
| Ron Blackburn | 610.08 |
| James Busha | 1,191.92 |
| Mark Carlson | 308.40 |
| Robert Chadasol | 380.76 |
| Richard Charles | 253.76 |
| Calvin Chester | 740.08 |
| Raymond Clarke | 522.31 |
| Mark Combs | 2,092.80 |
| Charles Connors | 11,052.74 |
| Ed Cox | 6,253.24 |
| Thomas Crawford | 1,239.28 |
| John Davis | 192.19 |
| Robert Davis | 2,601.87 |
| Harold Dauber | 1,703.92 |
| Peter Derbish | 70.56 |
| Paul Donovan | 1,645.70 |
| Matthew Donovan | 53.92 |
| Mike Elliot | 1,181.70 |
| Robert Estes | 17.76 |
| George Faloney | 317.20 |
| William Fichter | 2,848.48 |
| Charles Fleming | 19.32 |
| Daniel Fonzie | 217.87 |
| Ed Fonzie | 2,076.33 |
| Keith Foster | 1,254.84 |
| Michael Fryman | 685.56 |
| Joseph Golubski | 1,357.25 |
| Mark Geissinger | 1,973.44 |
| David Gilmore | 2,050.72 |
| Houston Gray | 1,331.07 |
| Timothy Hawk | 3,418.68 |
| Earl Hawkins | 326.80 |
| Robert Hepp | 398.40 |
| Bill Kash | 400.00 |
| Dave Kendall | 3,187.76 |
| Greg Kendall | 2,753.36 |

| EMPLOYEE NAME | GROSS AMOUNT DUE |
|---|---|
| Harold King | 2,591.76 |
| Jay Koathe | 479.04 |
| Mike Kuzmanko | 2,941.20 |
| Steve Kuozywski | 13.82 |
| Ron Love | 685.37 |
| Fred McAllister | 293.92 |
| Ed McDeavitt | 992.64 |
| Charles McHenry | 899.91 |
| Gary Miller | 1,691.10 |
| Robert Moore | 1,121.92 |
| Louis Murray | 1,976.33 |
| Frank Nobbs | 240.16 |
| Floyd O'Kinski | 940.48 |
| Charles Pack | 710.88 |
| Leonard Page | 180.36 |
| Robert Painter | 1,434.96 |
| Ron Park | 1,959.49 |
| Henry Penfield | 499.82 |
| Robert Peterman | 1,162.16 |
| Bob Petzer | 1,272.72 |
| Joseph Richards | 610.56 |
| Hugh Rumble | 1,522.56 |
| Richard Sarver | 40.56 |
| David Scheller | 619.74 |
| Wayne Schmuch | 21.60 |
| Nathaniel Scott | 445.68 |
| Bill Simok | 976.48 |
| Ron Slepski | 2,411.18 |
| Harry Smith | 55.76 |
| Harold Snowberger | 220.64 |
| Mark Saller | 171.36 |
| William Steurnagel | 365.57 |
| Martin Sulwalski | 64.00 |
| Edward Thomas | 1,239.09 |
| Robert Tinney | 484.58 |
| David Tritinger | 3,203.69 |
| George Volk | 138.48 |
| Jeffrey Wagner | 3,039.93 |
| William Waugh | 229.69 |
| William Weeks | 658.98 |
| James Whitehead | 46.20 |
| James E. Williams | 1,046.59 |
| David Wingerson | 2,639.62 |
| Joseph Wingerson | 1,029.60 |
| Jerry Wingerson | 21.76 |
| Charles Work | 1,206.91 |
| Dale Work | 252.46 |
| Elmer Work | 1,409.41 |
| James Work | 409.88 |
| Leroy Work | 800.96 |
| Ronald Work | 142.00 |
| Elbert Younger | 4,473.79 |
| John Zimmerman | 56.00 |
| William Wolf | 264.96 |
| TOTAL GROSS AMOUNT DUE | $112,437.05 |